1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10    SENEKA R. HILL,

11              Petitioner,            2:10 - cv - 1413 - GEB TJB

12         vs.

13    G.D. LEWIS,

14              Respondent.          ORDER, FINDINGS AND

15                                    RECOMMENDATIONS

16    _____/

17         Petitioner, Seneka Rayshawn Hill, is a state prisoner proceeding, *pro se*, with a petition

18    for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently serving an

19    aggregate sentence of twenty years in state prison after a jury convicted him on two counts of

20    second degree robbery (Cal. Penal Code § 211) and one count of making terrorist threats (*Id.* §

21    422). The jury also found true the sentencing enhancement allegation that Petitioner personally

22    used a firearm during the commission of both robberies (*Id.* § 12022.53(b)). Petitioner raises

23    three claims in this federal habeas petition; specifically: (1) The trial court failed to conduct a

24    hearing regarding Petitioner's competency to stand trial after Petitioner stated that he was

25    "hearing voices," violating his right to due process ("Claim I"); (2) the trial court erred in its

26    instruction to the jury regarding reasonable doubt, thereby depriving Petitioner of his right to due

1

process; and, (3) the trial court erred in imposing the upper term sentence as to one of the robbery

counts because it relied on four aggravating factors which were not submitted to the jury. For the

reasons stated herein, the federal habeas petition should be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

These cases arise from robbery incidents at two different
locations, involving two different victims.

On June 22, 2006, Ashok Chandra pulled into a Valero Gas
Station on 47th Avenue near 47th Street in Sacramento. Chandra
went inside the station to buy a soda while he waited for his gas to
pump. As he stood in line, he noticed Hill and [Petitioner's co-
defendant] Young standing together talking and looking at him.
Chandra noticed Hill change his T-shirt.

Chandra paid for his soda, walked back outside and stood by his
truck, filling a gas container he brought with him. Hill approached
Chandra and asked if he had change for a $20 bill.FN2 Chandra
said he did not. Hill asked several more times, to no avail. Hill
said he knew Chandra had change because he had seen Chandra's
wallet. He reached toward Chandra's pocket several times, but
Chandra pushed his hand away each time. Hill lifted his shirt,
revealing a handgun stuck in his waistband. Fearing for his life,
Chandra let Hill take his wallet and cell phone. Hill ran across the
street to another gas station, where he got into a light blue,
four-door sedan and sped away.

> FN2. At trial, Chandra testified that he later
> remembered a second individual from inside the
> store was standing behind him and holding him
> during the robbery. However, he admitted his
> memory was not clear on that point.

Chandra identified Hill on the gas station's surveillance
videotape. The tape showed that Hill and Young entered the store
at the same time, and focused on Chandra as they stood together
talking. Chandra left the store, followed by Hill. Young briefly
remained in line, watching Hill, and then left the store a minute
later. Videotape from a store camera shows a light blue, four-door
sedan moving through the Valero parking lot approximately 20
seconds later. Chandra told detectives the vehicle depicted in the
video leaving the Valero station looked similar to the one Hill got

---

[1]     The factual and procedural background is taken from the California Court of
Appeal, Third Appellate District decision on direct appeal from March 2009 and filed in this
Court by Respondent on September 29, 2010 as an attachment to his answer (hereinafter referred
to as the "Slip Op.").

into following the robbery. Photographs and registration documents confirmed that Young owned a light blue, four-door sedan. Detective Mike French later identified Hill and Young in the Valero surveillance videotape.

On June 30, 3006 [sic], Richard Rosa walked to his job at DD Discounts on Stockton Boulevard in Sacramento. His walk took him past Der Weinerschnitzel, where he noticed two men standing outside. When he arrived at DD Discounts, the store was still closed. As he waited to be let in, three individuals, including the two who had been standing outside Der Weinerschnitzel, approached. One of them, whom Rosa later identified as Hill, stood in front of Rosa and made small talk while the other two men positioned themselves behind Rosa. Hill pulled a gun out of his pocket, stuck it in Rosa's ribs, and demanded his "loot" and a ring Rosa was wearing. Rosa gave Hill his money and the ring, and Hill and the other two men ran off. Rosa identified Hill in the store's surveillance videotape and in a subsequent photo lineup.

Just prior to the robbery that morning, Nancy Skow, a manager at Der Weinerschnitzel, had a confrontation with Hill and two other men in the restaurant. Skow eventually told Hill and his two cohorts "not to come back in the [restaurant] again." After the three men left the restaurant, Skow noticed them walking toward DD Discount and, four to five minutes later, saw them running from the store. Skow first identified Hill in the restaurant's surveillance videotape, identified him a second time with "one hundred percent" certainty in a subsequent field showup, and ultimately identified him at trial. Skow identified Young with "eighty percent" certainty in the field showup, and again at trial.

Mike French, a detective who was also working on the Rosa robbery, identified Hill and Young in the Valero Gas Station surveillance videotape.

Hill and Young were charged together by consolidated complaint. Count one charged both defendants with the robbery of Chandra and specially alleged that Hill personally used a firearm and Young was armed with a firearm. Count two charged both defendants with the robbery of Rosa, specially alleging personal use of a firearm as to Hill and an arming enhancement as to Young. Count three charged Hill with making terrorist threats against another victim. . . .

On the eve of trial, at defendant Hill's request, the court held a *Marsden* hearing.FN3 Hill explained the bases for his request, including that he had expressed to his attorney "that I'm not understanding and things have to be explained to me very carefully" and told counsel "numerous times that I was hearing voices, and I have nightmares of being found guilty of a crime that I didn't commit." The court rejected all of the bases for the

motion with the exception of one related to a potential alibi witness. The matter was continued to allow counsel time to gather information on that issue.

>   FN3. *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

The following morning, defense counsel informed the court he had a doubt as to defendant Hill's competency. The court first completed the *Marsden* hearing, denying defendant's request for substitute counsel, and then turned to the competency issue. Defense counsel explained that the basis for his doubt was the fact that defendant had told him the prior morning, during the *Marsden* hearing, that "he was hearing voices." The following discussion took place between the court and Hill's counsel, attorney Hansen:

"THE COURT: Tell me how the subject came up and what he said in the morning.

"MR. HANSEN: Mr. Hill was talking to me about what was happening today, and that he was hearing voices, and that he wanted a Marsden [h]earing. And there were probably a couple of other comments that I can't recall exactly what he said but it was in the context of preparing today or getting ready to start the trial.

"THE COURT: All right. And then yesterday during the Marsden [h]earing I heard him say something about hearing voices. Is that what you're referring to?

"MR. HANSEN: I am, Your Honor.

"THE COURT: Anything else?

"MR. HANSEN: The fact that he indicated that he was filing a lawsuit against me caused me some concern.

"THE COURT: Concern about what?

"MR. HANSEN: Well, I haven't been served with any lawsuit. I don't know if that is true. It's an odd statement. I find it to be an odd statement.

"THE COURT: Have you noticed any other indication of a possible mental disorder before yesterday in your interactions with Mr. Hill, Mr. Hansen?

"MR. HANSEN: I would say that I'm not a doctor, but I will inform the court now that I discussed this issue with others last night in contemplation of expressing the doubt. But I believe there is a condition of fixation that may be occurring. But I-

4

1   "THE COURT: Would you please answer my question, Mr. Hansen[?]

2

3   "MR. HANSEN: Other than that, I have not observed anything else that I would say is a mental disorder.

4   "THE COURT: Do you remember what my question was?

5   "MR. HANSEN: I believe your question was, have I observed any other activities or behaviors that indicate there [were] any mental

6   problems.

7   "THE COURT: Before yesterday morning.

8   "MR. HANSEN: Correct.

9   "THE COURT: I take it your answer is no?

10   "MR. HANSEN: The answer is no.

11   "THE COURT: Anything you would like to add, Mr. Hansen?

12   "MR. HANSEN: No."

13   The court found, "[b]ased on what I heard from Mr. Hill yesterday, and based on what I heard from Mr. Hansen this morning," that

14   defendant was engaging in "manipulative malingering," and concluded there was no substantial evidence of incompetence and

15   no need to suspend the proceedings.

16   The jury found defendants guilty of all charges and found all of the special allegations true. . . . The court imposed sentence as follows:

17   Hill was sentenced to an aggregate prison term of 20 years, comprised of five years (the upper term) as to count one, one year

18   (one-third the middle term) on count two, and eight months (one-third the middle term) on count three, plus 10 years for the

19   firearm use enhancement on count one and three years four months for the firearm use enhancement on count two. . . .

20

21   The court ordered Hill to pay various fees and fines, including a $200 restitution fine pursuant to section 1202.4, subdivision (b),

22   and a $200 restitution fine (suspended) pursuant to section 1202.45. . . .

23   II. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

24   An application for writ of habeas corpus by a person in custody under judgment of a state

25   court can only be granted for violations of the Constitution or laws of the United States. *See* 28

26   U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

5

1   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

2   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

3   and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See Lindh v. Murphy*, 521 U.S.

4   320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim

5   decided on the merits in the state court proceedings unless the state court's adjudication of the

6   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

7   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

8   resulted in a decision that was based on an unreasonable determination of the facts in light of the

9   evidence presented in state court. *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-

10   93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

11       In applying AEDPA's standards, the federal court must "identify the state court decision

12   that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The

13   relevant state court determination for purposes of AEDPA review is the last reasoned state court

14   decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where

15   there has been one reasoned state judgment rejecting a federal claim, later unexplained orders

16   upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v.*

17   *Nunnemaker*, 501 U.S. 797, 803 (1991). To the extent no such reasoned opinion exists, courts

18   must conduct an independent review of the record to determine whether the state court clearly

19   erred in its application of controlling federal law, and whether the state court's decision was

20   objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question

21   under AEDPA is not whether a federal court believes the state court's determination was

22   incorrect but whether that determination was unreasonable—a substantially higher threshold."

23   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "When it is

24   clear, however, that the state court has not decided an issue, we review that question *de novo*."

25   *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S.

26   374, 377 (2005)).

III. ANALYSIS OF PETITIONER'S CLAIMS

1. Claim I

In Claim I, Petitioner contends that the trial court violated his constitutional right to due process when it failed to hold a hearing to determine whether Petitioner was competent to stand trial after Petitioner's counsel expressed doubt as to his competency and he told the court that he was hearing voices. The last reasoned state court decision on this claim, and each of Petitioner's claims, is the decision by the California Court of Appeal on Petitioner's direct appeal from his conviction. *Ylst*, 501 U.S. at 803. In concluding that Petitioner's right to not stand trial if incompetent was not violated, the Court of Appeal stated as follows:

*Section 1368 Competency Hearing*

> Defendant Hill contends the trial court erred by failing to conduct a section 1368 hearing after he informed his counsel he was hearing voices.

> Section 1368, subdivision (b) states, in pertinent part: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369."

> "Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal. But, when defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate v. Robinson* [(1966)] 383 U.S. 375 [15 L.Ed.2d 815]." (*People v. Pennington* (1967) 66 Cal.2d 508, 518 (*Pennington*).)

> "[T]his doubt which triggers the obligation of the trial judge to order a hearing on present sanity is not a subjective one but rather a doubt to be determined objectively from the record." (*People v. Sundberg* (1981) 124 Cal.App.3d 944, 955-956.)

> Defendant Hill first raised the issue of competency during the hearing on his Marsden motion, at which time counsel informed the court that defendant had, the prior day, indicated that he had been hearing voices. After inquiring further of defense counsel and learning counsel had observed no other behavior indicating mental incompetency, the court satisfied itself as to defendant's

7

1    competency to stand trial.

2    Under the substantial evidence test, more is required to raise a
     doubt than mere bizarre actions, bizarre statements, statements of
3    defense counsel that defendant is incapable of cooperating in his
     defense, or psychiatric testimony that defendant is immature,
4    dangerous, psychopathic, or homicidal or some reference to
     defendant's resulting inability to assist in his own defense. (*People*
5    *v. Laudermilk* (1967) 67 Cal.2d 272, 285; *People v. Halvorsen*
     (2007) 42 Cal.4th 379, 403.)

6
     Here, the statement made by defendant Hill's counsel to the court,
7    while significant, in our view cannot raise the requisite doubt.
     Counsel told the court defendant had told him he was hearing
8    voices. He did not, however, indicate that defendant was not able
     to understand the nature and purpose of the proceedings against
9    him or assist in his defense. (See *Pennington*, *supra*, 66 Cal.2d at
     p. 518 [present mental incompetence means the defendant is
10   "incapable, because of mental illness, of understanding the nature
     of the proceedings against him or of assisting in his defense"].) The
11   objective evidence before the court indicated the contrary, as
     defendant Hill demonstrated his ability to understand the
12   proceedings and articulate, in a coherent manner, the basis for his
     Marsden motion and his desire that certain witnesses be called to
13   testify. Absent any other objective indicia of mental incompetency,
     or any evidence to suggest that defendant's alleged hearing of
14   voices somehow rendered him incapable of understanding the
     proceedings or assisting in his defense, defense counsel's
15   representation to the court does not rise to the level of substantial
     evidence of a doubt as to defendant's competence. In that case, the
16   decision whether or not to order a section 1368 competency
     hearing was within the court's discretion. (*Pennington*, *supra*, 66
17   Cal.2d at p. 518.) Given defendant Hill's ability to participate in
     the motion proceedings and the timing of the competency claim on
18   the eve of trial and during a Marsden hearing, as well as the court's
     finding of "manipulative malingering," the trial court did not abuse
19   its discretion.

20   Slip Op. at 9-12.

21          The conviction of an accused person while he is legally incompetent violates due process.

22   *Bishop v. United States*, 350 U.S. 961 (1956); *see also Drope v. Missouri*, 420 U.S. 162, 171

23   (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the

24   capacity to understand the nature and object of the proceedings against him, to consult with

25   counsel, and to assist in preparing a defense may not be subjected to a trial."). The failure to

26   observe procedures adequate to protect a defendant's right not to be tried or convicted while

8

1    incompetent to stand trial deprives him of his due process right to a fair trial. *Pate v. Robinson*,

2    383 U.S. 375, 285 (1966). "[E]vidence of a defendant's irrational behavior, his demeanor at trial,

3    and any prior medical opinion on competence to stand trial are all relevant in determining

4    whether further inquiry is required." *Drope*, 420 U.S. at 180. "[E]ven one of these factors

5    standing alone may, in some circumstances, be sufficient," *id.*, though the Supreme Court has not

6    "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to

7    require resort to an adequate procedure." *Id.* at 172 (footnote omitted). A state court's

8    determination that a defendant is competent to stand trial is a factual determination which must

9    be given deference when reviewed in federal court on a petition for habeas corpus. *See Maggio v.*

10   *Fulford*, 462 U.S. 111 (1983) (per curiam) (relying on former 28 U.S.C. § 2254(d)(8)); *id.* at 118

11   (quoting *United States v. Oregon Medical Society*, 434 U.S. 326, 339 (1952) ("Face to face with

12   living witnesses the original trier of the facts holds a position of advantage from which appellate

13   judges are excluded.")); 28 U.S.C. § 2254(e)(1) (a determination of a factual issue made by a

14   State court shall be presumed to be correct); *id.* § 2254(d)(2).

15        In the present case, the California Court of Appeal's determination of the facts was

16   reasonable. The single fact which could possibly lead to a conclusion that Petitioner may have

17   been incompetent to stand trial was his statement that he was "hearing voices." Lodged Doc. No.

18   7 (Transcript of Marsden Hearing), at 50. Petitioner's counsel had not observed any other

19   indication of a possible mental disorder at anytime during his preparation for trial. *Id.* at 64-65.

20   Neither Petitioner nor his counsel suggested that the voices in his head were preventing him from

21   communicating with his counsel or assisting in his defense. Indeed, Petitioner indicated that he

22   had suggested witnesses for his counsel to interview and had urged his counsel to make certain

23   motions, attempting to assist in his own defense. *Id.* at 50, 53, 55. As the Court of Appeal

24   recognized, Petitioner also intelligently and articulately argued the basis for his motion to have

25   his counsel replaced. *Id.* at 49-50, 54; Slip Op. at 11.

26   / / /

1      Moreover, there is substantial evidence to support the trial court's conclusion, which was

2   accepted by the Court of Appeal, that Petitioner's actions amounted to "manipulative

3   malingering." Lodged Doc. No 7, at 66; Slip Op. at 12.  Petitioner did not say anything about

4   hearing voices or lead his counsel to believe that he was incompetent to stand trial until the

5   middle of jury selection for his trial. Lodged Doc. No. 7, at 66. Furthermore, Petitioner had stated

6   that he wanted his case to be severed from his co-defendant's, and it appears that, like the

7   defendant in *Fulford*, Petitioner believed delaying his trial, through whatever means available,

8   might achieve that goal. *Fulford*, 462 U.S. at 115 ("Most importantly for our purposes, the trial

9   judge concluded that respondent's surprise, eleventh-hour motion for appointment of a

10  competency commission 'was just a subterfuge on the part of this defendant to attempt to keep

11  from going to trial so that he would be tried at a different time from the other defendants.'"). At

12  the same time Petitioner began to hear voices in his head, Petitioner also attempted to have his

13  counsel removed, stating that he had filed a civil suit against his counsel and arguing that the

14  civil suit created a conflict of interest which prevented his current counsel from continuing to

15  represent him. Lodged Doc. No. 7, at 50, 54 (Petitioner stated: "I believe it is going to be a

16  conflict of interest if I'm suing him, for him to defend me."). If counsel would have been

17  removed, this would have led to a substantial delay in Petitioner's trial.

18      The timing of Petitioner's alleged incompetence—on the eve of trial—along with his

19  other attempts at delay, indicate that Petitioner was making a concerted effort to delay his trial.

20  As such, there was ample support for the trial court's reasonable determination that Petitioner

21  was competent to stand trial and that he was alleging his incompetency as a means of delay. That

22  finding is entitled to a presumption of correctness in this court which Petitioner has failed to

23  rebut. Petitioner is not entitled to relief on this claim.

24  / / /

25  / / /

26  / / /

2. Claim II

In Claim II, Petitioner alleges error in the trial court's instruction with relation to reasonable doubt. Petitioner contends that the trial court's instruction on reasonable doubt, CALCRIM 220, is erroneous because it only allows the jury to consider evidence presented in the courtroom and because it improperly conveys the principle of reasonable doubt.

CALCRIM 220, as read to the jury, states as follows:

> The fact that a criminal charge has been filed against the defendants is not evidence that the charge is true. You must not be biased against a defendants just because he has been arrested, charged with a crime, or brought to trial.
>
> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

Clerk's Tr. at 363; Rep's Tr. at 619-20.

In upholding the trial court's instruction, the Court of Appeal relied on its previous decision in *People v. Guerrero*, 155 Cal. App. 4th 1264, 66 Cal. Rptr. 3d 701 (2007).  In *Guerrero*, the Court of Appeal upheld CALCRIM 220, stating as follows:

> Defendant contends [CALCRIM 220] prevented the jury from considering a lack of evidence in deciding whether reasonable doubt existed. In support of his contention, defendant focuses on the phrase "the evidence that was received throughout the entire trial." Defendant argues his due process rights are violated by an instruction defining reasonable doubt "unless the concept of lack of evidence is included in the basic definition of reasonable doubt," thus rendering the instruction facially invalid. Defendant's argument is not well taken.

11

The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt." (*In re Winship* (1970) 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375.) An instruction which misstates the prosecution's burden to prove every element of the crime beyond a reasonable doubt violates due process. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583, 590 (*Victor*).)

In *Victor*, the Supreme Court explained the due process standard for evaluating instructions defining reasonable doubt. "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury.' " [Citation.] (*Victor*, *supra*, 511 U.S. at p. 5, 114 S.Ct. at p. 1243, 127 L.Ed.2d at p. 590.)

In *Victor*, the Supreme Court noted that it had found a reasonable doubt instruction to violate due process in only one case. (*See Victor*, *supra*, 511 U.S. at p. 5, 114 S.Ct. at p. 1243, 127 L.Ed.2d at p. 590, citing *Cage v. Louisiana* (1990) 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (per curiam).) In *Cage*, the jury was instructed that reasonable doubt "must be such doubt as would give rise to a grave uncertainty . . . it is an actual substantial doubt " and its negation involves a "moral certainty." (*Cage*, *supra*, 498 U.S. at p. 40, 111 S.Ct. at p. 329, 112 L.Ed.2d at pp. 341–342.) Instructing the jury with these phrases violated due process by suggesting to the jurors "a higher degree of doubt than is required for acquittal under the reasonable doubt standard." (*Id.* at p. 41, 111 S.Ct. at p. 329, 112 L.Ed.2d at p. 342.)

Unlike the instruction in *Cage*, CALCRIM No. 220 does not suggest an impermissible definition of reasonable doubt to the jury. The instruction defines reasonable doubt as the absence of an abiding conviction in the truth of the charges. "An instruction cast in terms of an abiding conviction as to guilt, . . . correctly states the government's burden of proof." (*Victor*, *supra*, 511 U.S. at pp. 14–15, 114 S.Ct. at p. 1247, 127 L.Ed.2d at p. 596.) The instruction neither lowers the prosecution's standard of proof nor raises the amount of doubt the jury must have in order to acquit a defendant.

Contrary to defendant's suggestion, CALCRIM No. 220 instructs the jury to acquit in the absence of evidence. In addressing defendant's claim, we consider whether a "reasonable juror would apply the instruction in the manner suggested by defendant."

1
2
3
4

> (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1493, 46
> Cal.Rptr.2d 645.) The jury is instructed to consider only the
> evidence, and to acquit unless the evidence proves defendant's guilt
> beyond a reasonable doubt. If the government presents no
> evidence, then proof beyond a reasonable doubt is lacking, and a
> reasonable juror applying this instruction would acquit the
> defendant.

5
6

> Due process requires nothing more. CALCRIM No. 220 does not
> violate due process.

7   *Id.* at 1267-69 (footnote omitted).

8        A challenge to a jury instruction as erroneous under state law is not a basis for federal

9   habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). "The only question . . . is 'whether

10  [a jury] instruction by itself so infected the entire trial that the resulting conviction violates due

11  process.'" *Id.* at 72 (citation omitted); *see Waddington v. Sarausad*, 555 U.S. 179 (2009). In

12  making that determination, "[t]he jury instruction may not be judged in artificial isolation, but

13  must be considered in the context of the instructions as a whole and the trial record." *Id.* (citation

14  and quotation marks omitted). "[I]t must be established not merely that the instruction is

15  undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional

16  right]." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Supreme Court has "'defined

17  the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S.

18  at 72–73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Petitioner's "burden is

19  especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be

20  prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

21       The federal constitution does not require that state courts define reasonable doubt in a

22  particular way. *See Victor v. Nebraska*, 511 U.S. 1, 6 (1994). Instead the instruction must

23  correctly communicate the concept of reasonable doubt to the jury. *See Holland v. United States*,

24  348 U.S. 121, 140 (1954). "The proper inquiry is not whether the instruction could have been

25  applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury

26  *did* so apply it. The constitutional question . . . is whether there is a reasonable likelihood that the

1   jury understood the instructions to allow conviction based on proof insufficient to meet the

2   *Winship* standard." *Victor*, 511 U.S. at 6 (emphasis in original, citation and quotation marks

3   omitted). In *Victor*, the Supreme Court found "[a]n instruction cast in terms of an abiding

4   conviction as to guilt, without reference to moral certainty, correctly states the government's

5   burden of proof." *Id.* at 14-15. Given that CALCRIM 220 defines reasonable doubt in terms of an

6   abiding conviction, it was not unreasonable for the Court of Appeal to conclude that CALCRIM

7   220 does not offend clearly established Supreme Court precedent.

8        3. Claim III

9        In Claim III, Petitioner contends, pursuant to *Cunningham v. California*, 549 U.S. 270

10   (2007), that his right to a jury trial was violated when the trial court sentenced him to the upper

11   term of five years on one of the robbery counts for which he was convicted based on aggravating

12   factors which were not tried before the jury. In denying Petitioner's claim, the California Court of

13   Appeal determined as follows:

14           Defendants contend the trial court's imposition of an upper term
             sentence as to count one denied them their constitutional right to
15           due process and to have a jury determine factors in aggravation
             beyond a reasonable doubt as set forth in *Cunningham v.*
16           *California* (2007) 549 U.S. 270 [166 L.Ed.2d 856] (*Cunningham*),
             *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403]
17           (*Blakely*), and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147
             L.Ed.2d 435] (*Apprendi*). We disagree.
18
             In *People v. Black* (2007) 41 Cal.4th 799 (*Black II*),FN6 the
19           California Supreme Court applied the *Apprendi* line of cases, as
             interpreted in *Cunningham*, to California's Determinate Sentencing
20           Law. It concluded "so long as a defendant is eligible for the upper
             term by virtue of facts that have been established consistently with
21           Sixth Amendment principles, the federal Constitution permits the
             trial court to rely upon any number of aggravating circumstances in
22           exercising its discretion to select the appropriate term by balancing
             aggravating and mitigating circumstances, regardless of whether
23           the facts underlying those circumstances have been found to be
             true by a jury." (*Black II*, *supra*, 41 Cal.4th at p. 813.)
24
             FN6. Defendant Young acknowledges that we are
25           bound by our Supreme Court's decision in *Black II*,
             as well as its companion case, *People v. Sandoval*
26           (2007) 41 Cal.4th 825 (*Sandoval*), but nonetheless

14

1    asserts his claim of sentencing error for the purpose
     of "exhausting his state remedies and preserving the
2    issues for federal review."

3    The presence of a single aggravating circumstance found in
     accordance with the *Apprendi* rule renders a defendant eligible for
4    the upper term. (*Black II*, *supra*, 41 Cal.4th at p. 815.) Therefore,
     "imposition of the upper term does not infringe upon the
5    defendant's constitutional right to jury trial so long as one legally
     sufficient aggravating circumstance has been found to exist by the
6    jury, has been admitted by the defendant, or is justified based upon
     the defendant's record of prior convictions." (*Id.* at p. 816.) "[A]ny
7    additional factfinding engaged in by the trial court in selecting the
     appropriate sentence among the three available options does not
8    violate the defendant's right to jury trial." (*Id.* at p. 812.)

9    The Supreme Court further held that the prior conviction exception
     rendering the defendant eligible for an upper term sentence is not
10   to be read "too narrowly." (*Black II*, *supra*, 41 Cal.4th at p. 819.)
     Numerous cases have interpreted this exception "to include not
11   only the fact that a prior conviction occurred, but also other related
     issues that may be determined by examining the records of the
12   prior convictions," such as whether defendant's prior convictions
     were "'numerous or of increasing seriousness'" (Cal. Rules of
13   Court, rule 4.421(b)(2))." (*Black II*, *supra*, 41 Cal.4th at pp. 819,
     820.)
14
     Here, in sentencing Hill to the upper term, the trial court relied on
15   two facts: (1) the fact that "defendant's prior convictions as an
     adult or sustained petitions in juvenile delinquency proceedings are
16   numerous and of increasing seriousness," and (2) the fact that
     "defendant was on parole when the crimes were committed."
17   Based on those facts together, or either fact alone, defendant Hill
     was eligible to receive the upper term. (*Black II*, supra, 41 Cal.4th
18   at p. 816.) Any additional factfinding by the court does not render
     defendant's sentence unlawful. (*Id.* at p. 812.)
19
     . . .
20
     Defendants urge that *Apprendi*, *Blakely*, and *Cunningham* were
21   wrongly interpreted by the California Supreme Court, and that
     *Black II* and *Sandoval* were wrongly decided. As defendants
22   correctly concede, however, we are bound by our Supreme Court's
     decisions in those cases. (*Auto Equity Sales, Inc. v. Superior Court*
23   (1962) 57 Cal.2d 450, 455.) There is no sentencing error here.

24   Slip Op. at 12-15.

25   / / /

26   / / /

15

1    The Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows

2    a judge to impose a sentence above the statutory maximum based on a fact, other than a prior

3    conviction, not found by a jury or admitted by the defendant. *Apprendi v. New Jersey*, 530 U.S.

4    466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004);

5    *United States v. Booker*, 543 U.S. 220 (2005). In *Cunningham v. California*, *supra*, the Supreme

6    Court had the opportunity to apply its previous rulings to California's determinate sentencing

7    law. Under California's determinate sentencing law, the statute defining most offenses, including

8    Petitioner's, "prescribes three precise terms of imprisonment—a lower, middle, and upper term

9    sentence." *Cunningham*, 549 U.S. at 277; *see People v. Black*, 35 Cal. 4th 1238, 1247, 29 Cal.

10   Rptr. 3d 740, 113 P.3d 534 (2005) ("*Black I*"), *overruled by Cunningham* (outlining California's

11   determinate sentencing law). California Penal Code section 1170, subsection (b) governs the trial

12   court's choice; it provides that "the court shall order imposition of the middle term, unless there

13   are circumstances in aggravation or mitigation of the crime." Therefore, the maximum sentence

14   which a defendant may receive based solely on the facts reflected in the jury verdict is the middle

15   term—the statutory maximum for purposes of the Sixth Amendment. *Cunningham*, 549 U.S. at

16   289; *Blakely*, 542 U.S. at 303 ("[T]he 'statutory maximum' for *Apprendi* purposes is the

17   maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury*

18   *verdict or admitted by the defendant*." (emphasis in original)).[2]

19   In California, in order for a trial court to sentence a defendant to the upper term, the court

20   need only find one aggravating factor. *See People v. Black*, 41 Cal. 4th 799, 805, 62 Cal. Rptr. 3d

21   569, 161 P.3d 1130 (2007) ("*Black II*"); *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008)

22   (accepting the California Supreme Court's decision in *Black II* as a valid interpretation of

23

24        [2]    Respondent maintains that in this case the upper term was the statutory maximum
     for purposes of the Sixth Amendment. It is difficult to reconcile this contention with the Supreme

25   Court's clear interpretation of California law in *Cunningham*. 549 U.S. at 288 ("[T]he middle
     term prescribed in California's statutes, not the upper term, is the relevant statutory maximum."

26   (citations omitted)). However, because at least one aggravating factor was available to the trial
     court in sentencing Petitioner, it is unnecessary to address this argument.

16

California law). Thus, "if at least one of the aggravating factors on which the judge relied upon in sentencing a defendant was established in a manner consistent with the Sixth Amendment, the defendant's sentence does not violate the Constitution." *Butler*, 528 F.3d at 643. Once imposition of the upper term is available because of either a prior conviction or an aggravating factor proved beyond a reasonable doubt to a jury, any additional aggravating factors determined by the judge are within his discretion in determining which sentence to impose. *Id.*

In count one, Petitioner was found guilty of second degree robbery. Cal. Penal Code § 211; *Id.* § 212.5. California law provides that "[r]obbery of the second degree is punishable by imprisonment in the state prison for two, three, or five years." *Id.* § 213(a)(2). Pursuant to California law, *id.* § 1170(c), the trial judge in Petitioner's case stated his reasons for imposing the upper term:

> The following factors are covered by *Cunningham*. The ones I'm precluded from using. (a)(2), the defendant used a weapon; (a)(8) the manner in which the crimes were carried out; (b)(1) the defendant engaged in violent conduct in getting a serious danger [sic]; (b)(5) the defendant's prior performance on juvenile probation and parole were unsatisfactory. The ones that I think factors in aggravation that I think are applicable and [that] I am relying on and do find to be present in thise case and do find to justify the higher term are the following: Of course, these are subdivisions of Rule 4.21(b)(2). *The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous and of increasing seriousness*, (b)(3) that would be applicable. The defendant has served a prior prison term, but I'm not going to consider it because of Section 1170(b) of the Penal Code. It's charged as an enhancing prior conviction. (b)(4) the defendant was on parole when the crimes were committed.
>
> As far as I'm concerned there are no circumstances in mitigation except for the defendant's young age, which is 21, but he's committed an awful lot of crime in those 21 years. I don't see that much as a fact in mitigation. I think the factors in aggravation substantially and decisively outweigh those in mitigation.
>
> Let me explain further my rationale for relying on the factors that I have enumerated as being usable aggravating factors. The fact that the defendant was on parole or probation at the time of the crime, as far as I'm concerned, this is within the exception of prior convictions, which all of these cases from *Apprendi* through

17

*Cunningham* recognize. Furthermore, under section 452(d) of the Evidence Code, I am entitled to take judicial notice and I do take judicial notice of the fact, the relevant fact here, and it seems pretty obvious to me there would be no point to having a jury determine that fact when Section 457 of the Evidence Code provides that once the court has taken judicial notice of the fact, that would otherwise be for the jury to determine, the court may and on request shall instruct the jury to accept the fact as true. Given that, there would be no point to a jury trial on that factor.

Also consecutive sentences withheld whereas here the Court is imposing – Court could impose consecutive sentences, but is not doing so. This is a factor that can be used in aggravation. It's not amendable to jury determination.

I said that I was taking judicial notice. What I mean is I'm taking judicial notice of what's in the probation report, which establishes the facts in aggravation I am relying on.

Mr. Hill is ineligible for probation. Probation is denied. Judgment and sentence with respect to Count One for violation of Section 211 of the Penal Code is that you be confined in the state prison for the higher term which is five years, and I'm choosing the higher term for the reasons I enumerated. I order you to serve an additional ten years pursuant to Section 12022.53(b) for having used a firearm in the commission of the crime.

Rep.'s Tr. at 653-55 (emphasis added).

The presentence probation report which the trial court referred to, took judicial notice of, and relied upon when imposing Petitioner's sentence lists a litany of prior offenses. *See* Clerk's Tr. at 36-43. Not including Petitioner's crimes committed as a juvenile, Petitioner had been convicted for crimes committed on six separate occasions. For instance, in 2004 Petitioner was arrested after he fled from police in a stolen vehicle while carrying cocaine. *Id.* at 42-43. That was his second attempt to evade police in a vehicle that year, and led to his third conviction of 2004. For that offense, Petitioner was sentenced to sixteen months in state prison. *Id.* at 43. As such, the Court of Appeal was reasonable in determining that Petitioner's prior convictions, which need not be proved to a jury, supported imposition of the upper term. *Apprendi*, 530 U.S. at 489; *Cunningham*, 549 U.S. at 282. Once Petitioner was eligible for the upper term due to his previous convictions, the trial court was free to consider other factors not proved to the jury in

18

1  determining which sentence within the available range was appropriate. *Butler*, 528 F.3d at 643.

2  Petitioner is not entitled to relief on this claim.

3  IV.  REQUEST FOR AN EVIDENTIARY HEARING

4  Finally, Petitioner requests an evidentiary hearing on his claims.  (*See* Pet'r's Traverse at

5  p. 4.)  A court presented with a request for an evidentiary hearing must first determine whether a

6  factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary

7  hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see*

8  *also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an

9  evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."

10  *Earp*, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is

11  "required to allege specific facts which, if true, would entitle him to relief."  *Ortiz v. Stewart*, 149

12  F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case,

13  Petitioner's claims are readily determined by the record.  Petitioner has not alleged any additional

14  facts that, if true, would entitle him to relief and, therefore, Petitioner fails to demonstrate that he

15  has a colorable claim for federal habeas relief.  Moreover, the Supreme Court has recently held

16  that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before

17  the state court that adjudicated the claim on the merits" and "that evidence introduced in federal

18  court has no bearing on" such review.  *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398,

19  1400 (2011).  Thus, his request will be denied.

20  V. CONCLUSION

21  Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary

22  hearing is DENIED.

23  For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

24  writ of habeas corpus be DENIED.

25  These findings and recommendations are submitted to the United States District Judge

26  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days

1 after being served with these findings and recommendations, any party may file written objections

2 with the court and serve a copy on all parties. Such a document should be captioned "Objections

3 to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be

4 served and filed within seven days after service of the objections. The parties are advised that

5 failure to file objections within the specified time may waive the right to appeal the District

6 Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file,

7 Petitioner may address whether a certificate of appealability should issue in the event he elects to

8 file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254

9 Cases (the district court must issue or deny a certificate of appealability when it enters a final

10 order adverse to the applicant).

11 DATED:  October 20, 2011

12

13

14

15

16 TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26