IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SENEKA R. HILL,

      Petitioner,　　　　　　　　2:10 - cv - 1413 - GEB TJB

   vs.

G.D. LEWIS,

      Respondent.　　　　　　　ORDER, FINDINGS AND

 　　　　　　　　　　　　　　　　　　RECOMMENDATIONS

_____/

      Petitioner, Seneka Rayshawn Hill, is a state prisoner proceeding, *pro se*, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently serving an aggregate sentence of twenty years in state prison after a jury convicted him on two counts of second degree robbery (Cal. Penal Code § 211) and one count of making terrorist threats (*Id.* § 422). The jury also found true the sentencing enhancement allegation that Petitioner personally used a firearm during the commission of both robberies (*Id.* § 12022.53(b)). Petitioner raises three claims in this federal habeas petition; specifically: (1) The trial court failed to conduct a hearing regarding Petitioner's competency to stand trial after Petitioner stated that he was "hearing voices," violating his right to due process ("Claim I"); (2) the trial court erred in its instruction to the jury regarding reasonable doubt, thereby depriving Petitioner of his right to due

1

process; and, (3) the trial court erred in imposing the upper term sentence as to one of the robbery counts because it relied on four aggravating factors which were not submitted to the jury. For the reasons stated herein, the federal habeas petition should be denied.

### I. FACTUAL AND PROCEDURAL BACKGROUND[1]

> These cases arise from robbery incidents at two different locations, involving two different victims.
>
> On June 22, 2006, Ashok Chandra pulled into a Valero Gas Station on 47th Avenue near 47th Street in Sacramento. Chandra went inside the station to buy a soda while he waited for his gas to pump. As he stood in line, he noticed Hill and [Petitioner's co-defendant] Young standing together talking and looking at him. Chandra noticed Hill change his T-shirt.
>
> Chandra paid for his soda, walked back outside and stood by his truck, filling a gas container he brought with him. Hill approached Chandra and asked if he had change for a $20 bill.FN2 Chandra said he did not. Hill asked several more times, to no avail. Hill said he knew Chandra had change because he had seen Chandra's wallet. He reached toward Chandra's pocket several times, but Chandra pushed his hand away each time. Hill lifted his shirt, revealing a handgun stuck in his waistband. Fearing for his life, Chandra let Hill take his wallet and cell phone. Hill ran across the street to another gas station, where he got into a light blue, four-door sedan and sped away.
>
>> FN2. At trial, Chandra testified that he later remembered a second individual from inside the store was standing behind him and holding him during the robbery. However, he admitted his memory was not clear on that point.
>
> Chandra identified Hill on the gas station's surveillance videotape. The tape showed that Hill and Young entered the store at the same time, and focused on Chandra as they stood together talking. Chandra left the store, followed by Hill. Young briefly remained in line, watching Hill, and then left the store a minute later. Videotape from a store camera shows a light blue, four-door sedan moving through the Valero parking lot approximately 20 seconds later. Chandra told detectives the vehicle depicted in the video leaving the Valero station looked similar to the one Hill got

---

[1] The factual and procedural background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from March 2009 and filed in this Court by Respondent on September 29, 2010 as an attachment to his answer (hereinafter referred to as the "Slip Op.").

2

into following the robbery. Photographs and registration documents confirmed that Young owned a light blue, four-door sedan. Detective Mike French later identified Hill and Young in the Valero surveillance videotape.

On June 30, 3006 [sic], Richard Rosa walked to his job at DD Discounts on Stockton Boulevard in Sacramento. His walk took him past Der Weinerschnitzel, where he noticed two men standing outside. When he arrived at DD Discounts, the store was still closed. As he waited to be let in, three individuals, including the two who had been standing outside Der Weinerschnitzel, approached. One of them, whom Rosa later identified as Hill, stood in front of Rosa and made small talk while the other two men positioned themselves behind Rosa. Hill pulled a gun out of his pocket, stuck it in Rosa's ribs, and demanded his "loot" and a ring Rosa was wearing. Rosa gave Hill his money and the ring, and Hill and the other two men ran off. Rosa identified Hill in the store's surveillance videotape and in a subsequent photo lineup.

Just prior to the robbery that morning, Nancy Skow, a manager at Der Weinerschnitzel, had a confrontation with Hill and two other men in the restaurant. Skow eventually told Hill and his two cohorts "not to come back in the [restaurant] again." After the three men left the restaurant, Skow noticed them walking toward DD Discount and, four to five minutes later, saw them running from the store. Skow first identified Hill in the restaurant's surveillance videotape, identified him a second time with "one hundred percent" certainty in a subsequent field showup, and ultimately identified him at trial. Skow identified Young with "eighty percent" certainty in the field showup, and again at trial.

Mike French, a detective who was also working on the Rosa robbery, identified Hill and Young in the Valero Gas Station surveillance videotape.

Hill and Young were charged together by consolidated complaint. Count one charged both defendants with the robbery of Chandra and specially alleged that Hill personally used a firearm and Young was armed with a firearm. Count two charged both defendants with the robbery of Rosa, specially alleging personal use of a firearm as to Hill and an arming enhancement as to Young. Count three charged Hill with making terrorist threats against another victim. . . .

On the eve of trial, at defendant Hill's request, the court held a *Marsden* hearing.FN3 Hill explained the bases for his request, including that he had expressed to his attorney "that I'm not understanding and things have to be explained to me very carefully" and told counsel "numerous times that I was hearing voices, and I have nightmares of being found guilty of a crime that I didn't commit." The court rejected all of the bases for the

3

motion with the exception of one related to a potential alibi witness. The matter was continued to allow counsel time to gather information on that issue.

> FN3. *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

The following morning, defense counsel informed the court he had a doubt as to defendant Hill's competency. The court first completed the *Marsden* hearing, denying defendant's request for substitute counsel, and then turned to the competency issue. Defense counsel explained that the basis for his doubt was the fact that defendant had told him the prior morning, during the *Marsden* hearing, that "he was hearing voices." The following discussion took place between the court and Hill's counsel, attorney Hansen:

"THE COURT: Tell me how the subject came up and what he said in the morning.

"MR. HANSEN: Mr. Hill was talking to me about what was happening today, and that he was hearing voices, and that he wanted a Marsden [h]earing. And there were probably a couple of other comments that I can't recall exactly what he said but it was in the context of preparing today or getting ready to start the trial.

"THE COURT: All right. And then yesterday during the Marsden [h]earing I heard him say something about hearing voices. Is that what you're referring to?

"MR. HANSEN: I am, Your Honor.

"THE COURT: Anything else?

"MR. HANSEN: The fact that he indicated that he was filing a lawsuit against me caused me some concern.

"THE COURT: Concern about what?

"MR. HANSEN: Well, I haven't been served with any lawsuit. I don't know if that is true. It's an odd statement. I find it to be an odd statement.

"THE COURT: Have you noticed any other indication of a possible mental disorder before yesterday in your interactions with Mr. Hill, Mr. Hansen?

"MR. HANSEN: I would say that I'm not a doctor, but I will inform the court now that I discussed this issue with others last night in contemplation of expressing the doubt. But I believe there is a condition of fixation that may be occurring. But I-

4

1   "THE COURT: Would you please answer my question, Mr. Hansen[?]

2

3   "MR. HANSEN: Other than that, I have not observed anything else that I would say is a mental disorder.

4   "THE COURT: Do you remember what my question was?

5   "MR. HANSEN: I believe your question was, have I observed any other activities or behaviors that indicate there [were] any mental problems.

6

7   "THE COURT: Before yesterday morning.

8   "MR. HANSEN: Correct.

9   "THE COURT: I take it your answer is no?

10   "MR. HANSEN: The answer is no.

11   "THE COURT: Anything you would like to add, Mr. Hansen?

12   "MR. HANSEN: No."

13   The court found, "[b]ased on what I heard from Mr. Hill yesterday, and based on what I heard from Mr. Hansen this morning," that defendant was engaging in "manipulative malingering," and concluded there was no substantial evidence of incompetence and no need to suspend the proceedings.

14

15

16   The jury found defendants guilty of all charges and found all of the special allegations true. . . . The court imposed sentence as follows: Hill was sentenced to an aggregate prison term of 20 years, comprised of five years (the upper term) as to count one, one year (one-third the middle term) on count two, and eight months (one-third the middle term) on count three, plus 10 years for the firearm use enhancement on count one and three years four months for the firearm use enhancement on count two. . . .

17

18

19

20

21   The court ordered Hill to pay various fees and fines, including a $200 restitution fine pursuant to section 1202.4, subdivision (b), and a $200 restitution fine (suspended) pursuant to section 1202.45. . . .

22

23   II. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

24   An application for writ of habeas corpus by a person in custody under judgment of a state

25   court can only be granted for violations of the Constitution or laws of the United States. *See* 28

26   U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

5

1  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).
2  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism
3  and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See Lindh v. Murphy*, 521 U.S.
4  320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim
5  decided on the merits in the state court proceedings unless the state court's adjudication of the
6  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,
7  clearly established federal law, as determined by the Supreme Court of the United States; or (2)
8  resulted in a decision that was based on an unreasonable determination of the facts in light of the
9  evidence presented in state court. *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-
10 93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

11      In applying AEDPA's standards, the federal court must "identify the state court decision
12 that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The
13 relevant state court determination for purposes of AEDPA review is the last reasoned state court
14 decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where
15 there has been one reasoned state judgment rejecting a federal claim, later unexplained orders
16 upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v.*
17 *Nunnemaker*, 501 U.S. 797, 803 (1991). To the extent no such reasoned opinion exists, courts
18 must conduct an independent review of the record to determine whether the state court clearly
19 erred in its application of controlling federal law, and whether the state court's decision was
20 objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question
21 under AEDPA is not whether a federal court believes the state court's determination was
22 incorrect but whether that determination was unreasonable—a substantially higher threshold."
23 *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "When it is
24 clear, however, that the state court has not decided an issue, we review that question *de novo*."
25 *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S.
26 374, 377 (2005)).

III. ANALYSIS OF PETITIONER'S CLAIMS

1. Claim I

In Claim I, Petitioner contends that the trial court violated his constitutional right to due process when it failed to hold a hearing to determine whether Petitioner was competent to stand trial after Petitioner's counsel expressed doubt as to his competency and he told the court that he was hearing voices. The last reasoned state court decision on this claim, and each of Petitioner's claims, is the decision by the California Court of Appeal on Petitioner's direct appeal from his conviction. *Ylst*, 501 U.S. at 803. In concluding that Petitioner's right to not stand trial if incompetent was not violated, the Court of Appeal stated as follows:

> *Section 1368 Competency Hearing*
>
> Defendant Hill contends the trial court erred by failing to conduct a section 1368 hearing after he informed his counsel he was hearing voices.
>
> Section 1368, subdivision (b) states, in pertinent part: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369."
>
> "Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal. But, when defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate v. Robinson* [(1966)] 383 U.S. 375 [15 L.Ed.2d 815]." (*People v. Pennington* (1967) 66 Cal.2d 508, 518 (*Pennington*).)
>
> "[T]his doubt which triggers the obligation of the trial judge to order a hearing on present sanity is not a subjective one but rather a doubt to be determined objectively from the record." (*People v. Sundberg* (1981) 124 Cal.App.3d 944, 955-956.)
>
> Defendant Hill first raised the issue of competency during the hearing on his Marsden motion, at which time counsel informed the court that defendant had, the prior day, indicated that he had been hearing voices. After inquiring further of defense counsel and learning counsel had observed no other behavior indicating mental incompetency, the court satisfied itself as to defendant's

competency to stand trial.

Under the substantial evidence test, more is required to raise a doubt than mere bizarre actions, bizarre statements, statements of defense counsel that defendant is incapable of cooperating in his defense, or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or some reference to defendant's resulting inability to assist in his own defense. (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285; *People v. Halvorsen* (2007) 42 Cal.4th 379, 403.)

Here, the statement made by defendant Hill's counsel to the court, while significant, in our view cannot raise the requisite doubt. Counsel told the court defendant had told him he was hearing voices. He did not, however, indicate that defendant was not able to understand the nature and purpose of the proceedings against him or assist in his defense. (See *Pennington*, *supra*, 66 Cal.2d at p. 518 [present mental incompetence means the defendant is "incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense"].) The objective evidence before the court indicated the contrary, as defendant Hill demonstrated his ability to understand the proceedings and articulate, in a coherent manner, the basis for his Marsden motion and his desire that certain witnesses be called to testify. Absent any other objective indicia of mental incompetency, or any evidence to suggest that defendant's alleged hearing of voices somehow rendered him incapable of understanding the proceedings or assisting in his defense, defense counsel's representation to the court does not rise to the level of substantial evidence of a doubt as to defendant's competence. In that case, the decision whether or not to order a section 1368 competency hearing was within the court's discretion. (*Pennington*, *supra*, 66 Cal.2d at p. 518.) Given defendant Hill's ability to participate in the motion proceedings and the timing of the competency claim on the eve of trial and during a Marsden hearing, as well as the court's finding of "manipulative malingering," the trial court did not abuse its discretion.

Slip Op. at 9-12.

The conviction of an accused person while he is legally incompetent violates due process. *Bishop v. United States*, 350 U.S. 961 (1956); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing a defense may not be subjected to a trial."). The failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while

8

incompetent to stand trial deprives him of his due process right to a fair trial. *Pate v. Robinson*, 383 U.S. 375, 285 (1966). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Drope*, 420 U.S. at 180. "[E]ven one of these factors standing alone may, in some circumstances, be sufficient," *id.*, though the Supreme Court has not "prescribe[d] a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure." *Id.* at 172 (footnote omitted). A state court's determination that a defendant is competent to stand trial is a factual determination which must be given deference when reviewed in federal court on a petition for habeas corpus. *See Maggio v. Fulford*, 462 U.S. 111 (1983) (per curiam) (relying on former 28 U.S.C. § 2254(d)(8)); *id.* at 118 (quoting *United States v. Oregon Medical Society*, 434 U.S. 326, 339 (1952) ("Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded.")); 28 U.S.C. § 2254(e)(1) (a determination of a factual issue made by a State court shall be presumed to be correct); *id.* § 2254(d)(2).

In the present case, the California Court of Appeal's determination of the facts was reasonable. The single fact which could possibly lead to a conclusion that Petitioner may have been incompetent to stand trial was his statement that he was "hearing voices." Lodged Doc. No. 7 (Transcript of Marsden Hearing), at 50. Petitioner's counsel had not observed any other indication of a possible mental disorder at anytime during his preparation for trial. *Id.* at 64-65. Neither Petitioner nor his counsel suggested that the voices in his head were preventing him from communicating with his counsel or assisting in his defense. Indeed, Petitioner indicated that he had suggested witnesses for his counsel to interview and had urged his counsel to make certain motions, attempting to assist in his own defense. *Id.* at 50, 53, 55. As the Court of Appeal recognized, Petitioner also intelligently and articulately argued the basis for his motion to have his counsel replaced. *Id.* at 49-50, 54; Slip Op. at 11.

/ / /

     Moreover, there is substantial evidence to support the trial court's conclusion, which was accepted by the Court of Appeal, that Petitioner's actions amounted to "manipulative malingering." Lodged Doc. No 7, at 66; Slip Op. at 12.  Petitioner did not say anything about hearing voices or lead his counsel to believe that he was incompetent to stand trial until the middle of jury selection for his trial. Lodged Doc. No. 7, at 66. Furthermore, Petitioner had stated that he wanted his case to be severed from his co-defendant's, and it appears that, like the defendant in *Fulford*, Petitioner believed delaying his trial, through whatever means available, might achieve that goal. *Fulford*, 462 U.S. at 115 ("Most importantly for our purposes, the trial judge concluded that respondent's surprise, eleventh-hour motion for appointment of a competency commission 'was just a subterfuge on the part of this defendant to attempt to keep from going to trial so that he would be tried at a different time from the other defendants.'"). At the same time Petitioner began to hear voices in his head, Petitioner also attempted to have his counsel removed, stating that he had filed a civil suit against his counsel and arguing that the civil suit created a conflict of interest which prevented his current counsel from continuing to represent him. Lodged Doc. No. 7, at 50, 54 (Petitioner stated: "I believe it is going to be a conflict of interest if I'm suing him, for him to defend me."). If counsel would have been removed, this would have led to a substantial delay in Petitioner's trial.

     The timing of Petitioner's alleged incompetence—on the eve of trial—along with his other attempts at delay, indicate that Petitioner was making a concerted effort to delay his trial. As such, there was ample support for the trial court's reasonable determination that Petitioner was competent to stand trial and that he was alleging his incompetency as a means of delay. That finding is entitled to a presumption of correctness in this court which Petitioner has failed to rebut. Petitioner is not entitled to relief on this claim.

/ / /

/ / /

/ / /

2. Claim II

In Claim II, Petitioner alleges error in the trial court's instruction with relation to reasonable doubt. Petitioner contends that the trial court's instruction on reasonable doubt, CALCRIM 220, is erroneous because it only allows the jury to consider evidence presented in the courtroom and because it improperly conveys the principle of reasonable doubt.

CALCRIM 220, as read to the jury, states as follows:

> The fact that a criminal charge has been filed against the defendants is not evidence that the charge is true. You must not be biased against a defendants just because he has been arrested, charged with a crime, or brought to trial.
>
> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

Clerk's Tr. at 363; Rep's Tr. at 619-20.

In upholding the trial court's instruction, the Court of Appeal relied on its previous decision in *People v. Guerrero*, 155 Cal. App. 4th 1264, 66 Cal. Rptr. 3d 701 (2007). In *Guerrero*, the Court of Appeal upheld CALCRIM 220, stating as follows:

> Defendant contends [CALCRIM 220] prevented the jury from considering a lack of evidence in deciding whether reasonable doubt existed. In support of his contention, defendant focuses on the phrase "the evidence that was received throughout the entire trial." Defendant argues his due process rights are violated by an instruction defining reasonable doubt "unless the concept of lack of evidence is included in the basic definition of reasonable doubt," thus rendering the instruction facially invalid. Defendant's argument is not well taken.

11

The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt." (*In re Winship* (1970) 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368, 375.) An instruction which misstates the prosecution's burden to prove every element of the crime beyond a reasonable doubt violates due process. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583, 590 (*Victor*).)

In *Victor*, the Supreme Court explained the due process standard for evaluating instructions defining reasonable doubt. "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury.' " [Citation.] (*Victor*, *supra*, 511 U.S. at p. 5, 114 S.Ct. at p. 1243, 127 L.Ed.2d at p. 590.)

In *Victor*, the Supreme Court noted that it had found a reasonable doubt instruction to violate due process in only one case. (*See Victor*, *supra*, 511 U.S. at p. 5, 114 S.Ct. at p. 1243, 127 L.Ed.2d at p. 590, citing *Cage v. Louisiana* (1990) 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (per curiam).) In *Cage*, the jury was instructed that reasonable doubt "must be such doubt as would give rise to a grave uncertainty . . . it is an actual substantial doubt " and its negation involves a "moral certainty." (*Cage*, *supra*, 498 U.S. at p. 40, 111 S.Ct. at p. 329, 112 L.Ed.2d at pp. 341–342.) Instructing the jury with these phrases violated due process by suggesting to the jurors "a higher degree of doubt than is required for acquittal under the reasonable doubt standard." (*Id.* at p. 41, 111 S.Ct. at p. 329, 112 L.Ed.2d at p. 342.)

Unlike the instruction in *Cage*, CALCRIM No. 220 does not suggest an impermissible definition of reasonable doubt to the jury. The instruction defines reasonable doubt as the absence of an abiding conviction in the truth of the charges. "An instruction cast in terms of an abiding conviction as to guilt, . . . correctly states the government's burden of proof." (*Victor*, *supra*, 511 U.S. at pp. 14–15, 114 S.Ct. at p. 1247, 127 L.Ed.2d at p. 596.) The instruction neither lowers the prosecution's standard of proof nor raises the amount of doubt the jury must have in order to acquit a defendant.

Contrary to defendant's suggestion, CALCRIM No. 220 instructs the jury to acquit in the absence of evidence. In addressing defendant's claim, we consider whether a "reasonable juror would apply the instruction in the manner suggested by defendant."

12

> (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1493, 46 Cal.Rptr.2d 645.) The jury is instructed to consider only the evidence, and to acquit unless the evidence proves defendant's guilt beyond a reasonable doubt. If the government presents no evidence, then proof beyond a reasonable doubt is lacking, and a reasonable juror applying this instruction would acquit the defendant.
>
> Due process requires nothing more. CALCRIM No. 220 does not violate due process.

*Id.* at 1267-69 (footnote omitted).

A challenge to a jury instruction as erroneous under state law is not a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). "The only question . . . is 'whether [a jury] instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 72 (citation omitted); *see Waddington v. Sarausad*, 555 U.S. 179 (2009). In making that determination, "[t]he jury instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* (citation and quotation marks omitted). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Supreme Court has "'defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72–73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Petitioner's "burden is especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

The federal constitution does not require that state courts define reasonable doubt in a particular way. *See Victor v. Nebraska*, 511 U.S. 1, 6 (1994). Instead the instruction must correctly communicate the concept of reasonable doubt to the jury. *See Holland v. United States*, 348 U.S. 121, 140 (1954). "The proper inquiry is not whether the instruction could have been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it. The constitutional question . . . is whether there is a reasonable likelihood that the

jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor*, 511 U.S. at 6 (emphasis in original, citation and quotation marks omitted). In *Victor*, the Supreme Court found "[a]n instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." *Id.* at 14-15. Given that CALCRIM 220 defines reasonable doubt in terms of an abiding conviction, it was not unreasonable for the Court of Appeal to conclude that CALCRIM 220 does not offend clearly established Supreme Court precedent.

3. Claim III

In Claim III, Petitioner contends, pursuant to *Cunningham v. California*, 549 U.S. 270 (2007), that his right to a jury trial was violated when the trial court sentenced him to the upper term of five years on one of the robbery counts for which he was convicted based on aggravating factors which were not tried before the jury. In denying Petitioner's claim, the California Court of Appeal determined as follows:

> Defendants contend the trial court's imposition of an upper term sentence as to count one denied them their constitutional right to due process and to have a jury determine factors in aggravation beyond a reasonable doubt as set forth in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856] (*Cunningham*), *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403] (*Blakely*), and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*). We disagree.
>
> In *People v. Black* (2007) 41 Cal.4th 799 (*Black II*),FN6 the California Supreme Court applied the *Apprendi* line of cases, as interpreted in *Cunningham*, to California's Determinate Sentencing Law. It concluded "so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (*Black II*, *supra*, 41 Cal.4th at p. 813.)
>
>> FN6. Defendant Young acknowledges that we are bound by our Supreme Court's decision in *Black II*, as well as its companion case, *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), but nonetheless

14

> asserts his claim of sentencing error for the purpose of "exhausting his state remedies and preserving the issues for federal review."
>
> The presence of a single aggravating circumstance found in accordance with the *Apprendi* rule renders a defendant eligible for the upper term. (*Black II*, *supra*, 41 Cal.4th at p. 815.) Therefore, "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Id.* at p. 816.) "[A]ny additional factfinding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial." (*Id.* at p. 812.)
>
> The Supreme Court further held that the prior conviction exception rendering the defendant eligible for an upper term sentence is not to be read "too narrowly." (*Black II*, *supra*, 41 Cal.4th at p. 819.) Numerous cases have interpreted this exception "to include not only the fact that a prior conviction occurred, but also other related issues that may be determined by examining the records of the prior convictions," such as whether defendant's prior convictions were "'numerous or of increasing seriousness'" (Cal. Rules of Court, rule 4.421(b)(2))." (*Black II*, *supra*, 41 Cal.4th at pp. 819, 820.)
>
> Here, in sentencing Hill to the upper term, the trial court relied on two facts: (1) the fact that "defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous and of increasing seriousness," and (2) the fact that "defendant was on parole when the crimes were committed." Based on those facts together, or either fact alone, defendant Hill was eligible to receive the upper term. (*Black II*, supra, 41 Cal.4th at p. 816.) Any additional factfinding by the court does not render defendant's sentence unlawful. (*Id.* at p. 812.)
>
> . . .
>
> Defendants urge that *Apprendi*, *Blakely*, and *Cunningham* were wrongly interpreted by the California Supreme Court, and that *Black II* and *Sandoval* were wrongly decided. As defendants correctly concede, however, we are bound by our Supreme Court's decisions in those cases. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) There is no sentencing error here.

Slip Op. at 12-15.

/ / /

/ / /

The Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant. *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Booker*, 543 U.S. 220 (2005). In *Cunningham v. California*, *supra*, the Supreme Court had the opportunity to apply its previous rulings to California's determinate sentencing law. Under California's determinate sentencing law, the statute defining most offenses, including Petitioner's, "prescribes three precise terms of imprisonment—a lower, middle, and upper term sentence." *Cunningham*, 549 U.S. at 277; *see People v. Black*, 35 Cal. 4th 1238, 1247, 29 Cal. Rptr. 3d 740, 113 P.3d 534 (2005) ("*Black I*"), *overruled by Cunningham* (outlining California's determinate sentencing law). California Penal Code section 1170, subsection (b) governs the trial court's choice; it provides that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." Therefore, the maximum sentence which a defendant may receive based solely on the facts reflected in the jury verdict is the middle term—the statutory maximum for purposes of the Sixth Amendment. *Cunningham*, 549 U.S. at 289; *Blakely*, 542 U.S. at 303 ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (emphasis in original)).[2]

In California, in order for a trial court to sentence a defendant to the upper term, the court need only find one aggravating factor. *See People v. Black*, 41 Cal. 4th 799, 805, 62 Cal. Rptr. 3d 569, 161 P.3d 1130 (2007) ("*Black II*"); *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008) (accepting the California Supreme Court's decision in *Black II* as a valid interpretation of

---

[2] Respondent maintains that in this case the upper term was the statutory maximum for purposes of the Sixth Amendment. It is difficult to reconcile this contention with the Supreme Court's clear interpretation of California law in *Cunningham*. 549 U.S. at 288 ("[T]he middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum." (citations omitted)). However, because at least one aggravating factor was available to the trial court in sentencing Petitioner, it is unnecessary to address this argument.

California law). Thus, "if at least one of the aggravating factors on which the judge relied upon in sentencing a defendant was established in a manner consistent with the Sixth Amendment, the defendant's sentence does not violate the Constitution." *Butler*, 528 F.3d at 643. Once imposition of the upper term is available because of either a prior conviction or an aggravating factor proved beyond a reasonable doubt to a jury, any additional aggravating factors determined by the judge are within his discretion in determining which sentence to impose. *Id.*

In count one, Petitioner was found guilty of second degree robbery. Cal. Penal Code § 211; *Id.* § 212.5. California law provides that "[r]obbery of the second degree is punishable by imprisonment in the state prison for two, three, or five years." *Id.* § 213(a)(2). Pursuant to California law, *id.* § 1170(c), the trial judge in Petitioner's case stated his reasons for imposing the upper term:

> The following factors are covered by *Cunningham*. The ones I'm precluded from using. (a)(2), the defendant used a weapon; (a)(8) the manner in which the crimes were carried out; (b)(1) the defendant engaged in violent conduct in getting a serious danger [sic]; (b)(5) the defendant's prior performance on juvenile probation and parole were unsatisfactory. The ones that I think factors in aggravation that I think are applicable and [that] I am relying on and do find to be present in this case and do find to justify the higher term are the following: Of course, these are subdivisions of Rule 4.21(b)(2). *The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous and of increasing seriousness*, (b)(3) that would be applicable. The defendant has served a prior prison term, but I'm not going to consider it because of Section 1170(b) of the Penal Code. It's charged as an enhancing prior conviction. (b)(4) the defendant was on parole when the crimes were committed.
> 
> As far as I'm concerned there are no circumstances in mitigation except for the defendant's young age, which is 21, but he's committed an awful lot of crime in those 21 years. I don't see that much as a fact in mitigation. I think the factors in aggravation substantially and decisively outweigh those in mitigation.
> 
> Let me explain further my rationale for relying on the factors that I have enumerated as being usable aggravating factors. The fact that the defendant was on parole or probation at the time of the crime, as far as I'm concerned, this is within the exception of prior convictions, which all of these cases from *Apprendi* through

> *Cunningham* recognize. Furthermore, under section 452(d) of the Evidence Code, I am entitled to take judicial notice and I do take judicial notice of the fact, the relevant fact here, and it seems pretty obvious to me there would be no point to having a jury determine that fact when Section 457 of the Evidence Code provides that once the court has taken judicial notice of the fact, that would otherwise be for the jury to determine, the court may and on request shall instruct the jury to accept the fact as true. Given that, there would be no point to a jury trial on that factor.
>
> Also consecutive sentences withheld whereas here the Court is imposing – Court could impose consecutive sentences, but is not doing so. This is a factor that can be used in aggravation. It's not amendable to jury determination.
>
> I said that I was taking judicial notice. What I mean is I'm taking judicial notice of what's in the probation report, which establishes the facts in aggravation I am relying on.
>
> Mr. Hill is ineligible for probation. Probation is denied. Judgment and sentence with respect to Count One for violation of Section 211 of the Penal Code is that you be confined in the state prison for the higher term which is five years, and I'm choosing the higher term for the reasons I enumerated. I order you to serve an additional ten years pursuant to Section 12022.53(b) for having used a firearm in the commission of the crime.

Rep.'s Tr. at 653-55 (emphasis added).

The presentence probation report which the trial court referred to, took judicial notice of, and relied upon when imposing Petitioner's sentence lists a litany of prior offenses. *See* Clerk's Tr. at 36-43. Not including Petitioner's crimes committed as a juvenile, Petitioner had been convicted for crimes committed on six separate occasions. For instance, in 2004 Petitioner was arrested after he fled from police in a stolen vehicle while carrying cocaine. *Id.* at 42-43. That was his second attempt to evade police in a vehicle that year, and led to his third conviction of 2004. For that offense, Petitioner was sentenced to sixteen months in state prison. *Id.* at 43. As such, the Court of Appeal was reasonable in determining that Petitioner's prior convictions, which need not be proved to a jury, supported imposition of the upper term. *Apprendi*, 530 U.S. at 489; *Cunningham*, 549 U.S. at 282. Once Petitioner was eligible for the upper term due to his previous convictions, the trial court was free to consider other factors not proved to the jury in

determining which sentence within the available range was appropriate. *Butler*, 528 F.3d at 643. Petitioner is not entitled to relief on this claim.

### IV.  REQUEST FOR AN EVIDENTIARY HEARING

Finally, Petitioner requests an evidentiary hearing on his claims. (*See* Pet'r's Traverse at p. 4.) A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." *Earp*, 431 F.3d at 1167 (citations omitted). To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted). In this case, Petitioner's claims are readily determined by the record. Petitioner has not alleged any additional facts that, if true, would entitle him to relief and, therefore, Petitioner fails to demonstrate that he has a colorable claim for federal habeas relief. Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398, 1400 (2011). Thus, his request will be denied.

### V. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: October 20, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE